UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

L.E.L.[1]                                                        CIVIL ACTION

VERSUS                                                    NO. 06-3719

JO ANNE B. BARNHART,                               SECTION "A" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, L.E.L., a minor, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration (the "Commissioner"), denying his claim for childhood

Supplemental Security Income ("SSI") benefits under Title XVI of the Act.  42 U.S.C.

§ 402 et seq.  The matter was referred to a United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) and Local Rule 73.2E(B).

---

[1]Pursuant to a directive from the Judicial Conference of the United States and an order of the Chief Judge of this court, all parties must refer to minors in pleadings filed in this court only by the minor's initials and must refrain from putting dates of birth and social security numbers in public records. Both plaintiff's and defendant's counsel have violated this rule.

Plaintiff filed a timely memorandum of facts and law.  Record Doc. No. 15. Defendant filed a timely reply memorandum of facts and law.  Record Doc. No. 16.

I.      PROCEDURAL HISTORY

L.E.L. was 12 years old on the date of the hearing before an Administrative Law Judge ("ALJ").  His adoptive mother, who is also his maternal aunt, filed an application for SSI on his behalf on June 10, 2002, alleging a disability onset date of January 1, 2001 because of depression and anxiety.  (Tr. 37-38).  After his application was denied, plaintiff filed a timely request for a hearing.  A hearing was conducted before an ALJ on October 2, 2003.  The ALJ issued a decision dated December 12, 2003, finding that L.E.L. was not disabled.  (Tr. 19-24).  The Appeals Council denied plaintiff's request for review on May 24, 2006 (Tr. 5-7), and the decision of the ALJ became the final decision of the Commissioner for purposes of this court's review.

II.     STATEMENT OF THE ISSUE ON APPEAL

Plaintiff's request for judicial review raises the following issue:

A.      Whether the ALJ erred in finding that L.E.L. does not have a marked limitation in the domain of caring for oneself.

III.    ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following findings relevant to the issue on appeal:

A.      L.E.L. has depression, which is a severe impairment.

2

B.    His impairments do not meet, medically equal or functionally equal the criteria for any impairment listed in Appendix 1, Subpart P, Part 404.

C.    Plaintiff's assertions regarding symptoms, pain, functional limitations and restrictions of activities of daily living are exaggerated, lack corroboration or substantiation in the medical evidence, and are not credible as to a disabling impairment.

D.    There is no evidence of limitation in the domain of caring for yourself.

E.    L.E.L. has a marked limitation in the domain of interacting and relating with others.

F.    He has not been disabled as defined in the Act at any time through the date of this decision.

(Tr. 23-24).

IV.   ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);

3

Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To qualify for SSI, a claimant must be "disabled" as defined by the Act.  42 U.S.C. § 423(a)(1)(D).  In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("1996 Act"), which redefined the eligibility standard for children under the SSI disability determination process.  This statute applies to all child disability applicants who filed claims on or after August 22, 1996 or whose cases were not finally adjudicated before that date.  Id. § 211(d)(1)(A)(I).

4

According to the 1996 Act, "(a)n individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 1382c(a)(3)(C)(I).

The Commissioner's final regulations in effect at the time of the ALJ's decision provide a three-step procedure for evaluating a child's claim of disability. The first step is to determine whether the claimant is engaging or has engaged in substantial gainful activity. If the answer is "yes," the claimant will be found not disabled. If the answer is "no," the second step requires a determination whether the claimant has a medically determinable severe impairment. If not, the claimant will be found not disabled. If the claimant has such an impairment, the last step is to determine whether the impairment meets or equals in severity, either medically or functionally, an impairment listed in Appendix 1, Subpart P, Part 404 of the Commissioner's regulations ("the Listings"). If the claimant has such an impairment and the impairment meets the duration requirement, the claimant will be found disabled. If not, the claimant will be found not disabled. 20 C.F.R. § 416.924 (2003).

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history."  Martinez, 64 F.3d at 174; accord Perez v. Barnhart, 415 F.3d 457, 462 (5th Cir. 2005).

B.      Factual Background

Plaintiff's adoptive mother, Joycelyn Miller, before she was sworn to testify, stated that L.E.L. lives with her and there is no one else in the household.  She stated that plaintiff's birth mother, who is Miller's sister, had 16 or 17 children and that she gave a few of the children to different relatives.  Miller said she told her sister when she was pregnant with L.E.L. that she (Miller) would take the baby.  (Tr. 158-59).

Miller said that L.E.L. is in regular classes in the seventh grade and passes his classes with a C average.  She stated that he does not play any sports and does not have any friends.  She said she cannot get him to go outside or do anything, which is why she took him to counseling at the YWCA for about five or six months, and then he was referred to the mental health unit.  (Tr. 160).

Plaintiff's mother stated that she lives on Social Security disability benefits, which she receives for depression.  She said that all of her sisters suffer with depression and that

6

her father had manic depression.  She stated that L.E.L. had been going to group therapy sessions every week, but he now goes every other week.  (Tr. 161).

Miller stated that she does not have an issue with plaintiff's school work, but she is concerned that he is depressed and just sits around the house.  She said he did not go out of the house for as much as two weeks during the previous summer and that he has been doing this for years.  She stated that this is not healthy or normal for a 12-year-old boy.  Miller said she did not realize that L.E.L. was depressed until her aunt, who is a nurse, told her that he was, and she then began taking him to the YWCA.  (Tr. 162-63).

Plaintiff's mother said she and L.E.L. have been getting by on what she brings in and will continue to do so whether or not he gets any benefits.  She stated that she was told by one of the social workers at the local Social Security office to apply for benefits for L.E.L. and she just wants him to get help for his depression and not be sitting around the house all day.  (Tr. 163).

Miller said that plaintiff's pediatrician is at Manhattan Medical Clinic and that he goes to the West Jefferson Mental Health Unit.  (Tr. 164-65).  After being sworn in, Miller testified that she has had permanent custody of L.E.L. since he was a baby, which was awarded by a judge.  She said that plaintiff was born in 1991 and is in the seventh grade.  (Tr. 166).

Plaintiff's mother stated that he fights her about doing his homework and he does not complete his homework.  She said he had a video game that he liked to play, but it is broken.  (Tr. 167).  She testified that he sees his siblings just about every day.  She said that her children are 23 and 29 years old, respectively, and not living with her, but that L.E.L. got along fine with them when they were all living together.  She said L.E.L. thinks of them as his siblings.  She stated that they see her daughter every day because her daughter drops off her own five-year-old daughter for Miller to babysit while her daughter is at work.  (Tr. 168).  She testified that L.E.L. does not get along very well with this five-year-old cousin.

Miller stated that L.E.L. waits for the bus to school about two blocks from their house and that he is always on time and never misses the bus.  (Tr. 168-69).

Miller testified that he recently had a test at the hospital to look inside his stomach and he has a huge hiatal hernia.  She said he had seen his pediatrician and a neurologist in the last week, and that the neurologist prescribed medication for his migraine headaches.  (Tr. 176).  She stated that he gets a nervous stomach every day before school, so that he has to go to the bathroom before leaving for the bus.

Plaintiff's mother said she talks to him every night before school.  She stated that she and the teachers literally had to drag him into school since preschool and through about the third grade, and sometimes he would run out of the class and they would have

8

to drag him back in.  (Tr. 176-77).  She said he just does not like school and now that he

knows he has to be there, he gets a nervous and upset stomach.

Miller testified that L.E.L. does not like to take baths.  She said he likes to be clean

and have clean clothes, but he will say that he is going to take a bath, but then he does

not feel like doing it.  She stated she has to make him take a bath when she can. (Tr. 177).

Plaintiff's mother said he has been going to the mental health clinic for about one

and one-half years and that he attends a Saturday session with four or five other boys.

She stated that he takes Topamax for depression, Benadryl or something for sleep and

Prevacid for his hernia.  She did not know if the hernia was going to be repaired but said

that plaintiff's doctor had looked into his stomach twice in the past year to stay on top of

the hernia and make sure it does not spread to plaintiff's heart. (Tr. 178).  She stated that

he also takes medication for migraines.

Miller testified that L.E.L. was in a car accident when he was six years old and that

he still has a dent in his head from it.  She said the doctors were surprised that plaintiff

was not brain-damaged but they told her he was traumatized by the accident.  (Tr. 179).

Miller stated that plaintiff sees his birth mother about once a week but that they

do not have a good or even a fair relationship.  (Tr. 179-80).  She said she does not want

her son to mow the lawn because he is too young and is sometimes clumsy.  (Tr. 182).

9

She testified that L.E.L. suffers from bronchitis as well as the hiatal hernia and headaches. (Tr. 185). She said he sees his pediatrician whenever he is sick and that he is going to start speech therapy at school at the recommendation of his principal. (Tr. 187-88).

L.E.L. testified that he had a Playstation II but it is broken. (Tr. 167). He said that he does not eat breakfast at home or at school because breakfast is over by the time he arrives at school. He said he gets on the bus at 7:05 a.m. and school starts at 7:35 a.m. He stated that he sits with friends on the bus, including his friend Justin who lives down the street from him. (Tr. 170-71). However, L.E.L. said he does not play with Justin after school because he does not like to go outside. He testified that he sits around and watches television all day.

L.E.L. stated that he has home room when he gets off the bus and then he goes to English in the second period, which is his favorite class, followed by reading with the same teacher, which he also likes. (Tr. 171-72). He testified that his next class is social studies with a different teacher, who is his worst teacher, but that he does well in the class anyway. He said he is learning in school.

Plaintiff stated that he does not sit with anyone at lunch time. (Tr. 173). He said it is not because he does not like people, but because he has no reason to talk and does not want to talk to anyone. He testified that he sometimes raises his hand in class, but

not every day.  He said his physical education class is okay because they just do exercises and sit around.  (Tr. 173).

L.E.L. testified that he does not have a best friend.  He said he gets his lunch at school and he never misses school except when he is sick.  He stated that his favorite brother is his 24-year-old brother, whom Miller stated is his natural brother by his biological mother.  L.E.L. said that Gilbert lives down the street with their grandmother, he sees Gilbert about once a week and they play games at their grandmother's house.  (Tr. 174-75).

Plaintiff said his favorite food is pizza.  He testified that he takes showers by himself in the evening, washes his hair and brushes his teeth.  (Tr. 175).

L.E.L. stated that he gets headaches every day but does not know what causes them.  (Tr. 176).  He said he does not like going to meetings at West Jefferson Mental Health Clinic.  He stated that his last meeting was about two weeks earlier and that he would go again next Saturday.  (Tr. 177-78).

Plaintiff said he does not get into fights at school.  He testified that, most of the time, he does not sleep through the night but wakes up around 4:00 in the morning and is only sometimes able to go back to sleep.  He said he and his mother and grandmother went to Biloxi for three days in the summer for a vacation.  (Tr. 180).  He said he liked it a little bit.  He said he had never gone fishing but he would like to go.  (Tr. 181).

11

L.E.L. testified that he does not go for walks or go outside at all.  He said his mother pays someone to cut the grass and she dos not want him to do it.  (Tr. 182).

Plaintiff stated that he does not have a girlfriend and does not like any particular girl.  (Tr. 183).  He said he has a bicycle but does not ride it much because the seat is too hard.  He testified that he takes a bath about every two days and brushes his teeth every day, sometimes.  (Tr. 184-85).

L.E.L. said he does not like school or doing homework, but that he does do his homework.  He said other kids do not pick on him at school.  When asked what he does not like about school, he stated, "Everything, the waking up part."  (Tr. 185).

Plaintiff testified that he gets headaches all the time at any time of day, and that his mother gives him Tylenol if he tells her that he has a headache.  He said he goes to sleep about 10:00 p.m.  He stated that he does not know how to play baseball and does not have a glove and ball.  (Tr. 186).

C.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 20-21).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

D.    Plaintiff's Appeal

12

The ALJ considered whether L.E.L.'s impairments meet, equal or functionally equal the criteria of any Listing and decided that they do not.  Plaintiff contends that the ALJ erred by not finding that he has marked impairments in two domains, such that he would functionally equal a Listing.

An ALJ must assess functional equivalence in children by examining the child's limitations in six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1).

An impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain.  Id. § 416.926a(a).  The regulations define "marked" as follows.

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

Id. § 416.926a(e)(1)(i) (emphasis added).

The ALJ found that L.E.L. has a marked limitation in the domain of interacting and relating with others, but has no limitation in the domain of caring for oneself.  Thus,

13

the only issue on appeal is whether the ALJ erred by finding that L.E.L. has less than a

marked limitation in the domain of caring for oneself.  If L.E.L. has a second marked

limitation, then he is disabled by definition.

The Commissioner has promulgated regulations that define the domain of caring

for oneself, as follows.

> (k) Caring for yourself.  In this domain, we consider how well you maintain
> a healthy emotional and physical state, including how well you get your
> physical and emotional wants and needs met in appropriate ways; how you
> cope with stress and changes in your environment; and whether you take
> care of your own health, possessions, and living area.
> (1) General.
> (i)  Caring for yourself effectively, which includes regulating yourself,
> depends upon your ability to respond to changes in your emotions and the
> daily demands of your environment to help yourself and cooperate with
> others in taking care of your personal needs, health and safety.  It is
> characterized by a sense of independence and competence.  The effort to
> become independent and competent should be observable throughout your
> childhood.
> (ii)  Caring for yourself effectively means becoming increasingly
> independent in making and following your own decisions.  This entails
> relying on your own abilities and skills, and displaying consistent judgment
> about the consequences of caring for yourself.  As you mature, using and
> testing your own judgment helps you develop confidence in your
> independence and competence.  Caring for yourself includes using your
> independence and competence to meet your physical needs, such as
> feeding, dressing, toileting, and bathing, appropriately for your age.
> (iii)  Caring for yourself effectively requires you to have a basic
> understanding of your body, including its normal functioning, and of your
> physical and emotional needs.  To meet these needs successfully, you must
> employ effective coping strategies, appropriate to your age, to identify and
> regulate your feelings, thoughts, urges, and intentions.  Such strategies are

based on taking responsibility for getting your needs met in an appropriate
and satisfactory manner.
(iv) Caring for yourself means recognizing when you are ill, following
recommended treatment, taking medication as prescribed, following safety
rules, responding to your circumstances in safe and appropriate ways,
making decisions that do not endanger yourself, and knowing when to ask
for help from others.

Id. § 416.926a(k)(1).

L.E.L. was 12 years old on the hearing date and on the date of the ALJ's decision.

Thus, the regulations explain what caring for yourself means for school-age children:

(iv) School-age children (age 6 to attainment of age 12).  You should be
independent in most day-to-day activities (e.g., dressing yourself, bathing
yourself), although you may still need to be reminded sometimes to do
these routinely.  You should begin to recognize that you are competent in
doing some activities and that you have difficulty with others.  You should
be able to identify those circumstances when you feel good about yourself
and when you feel bad.  You should begin to develop understanding of
what is right and wrong, and what is acceptable and unacceptable behavior.
You should begin to demonstrate consistent control over your behavior,
and you should be able to avoid behaviors that are unsafe or otherwise not
good for you.  You should begin to imitate more of the behavior of adults
you know.

Id. § 416.926a(k)(2)(iv).

The ALJ in the instant case found that L.E.L. has no limitation in the domain of

caring for oneself.  Plaintiff argues that he suffers from a marked limitation in this

domain because of record evidence that he has experienced suicidal ideation, difficulties

with sleep, low energy, sadness, depression and worry about family members, and because he is easily upset and gets angry and irritable.

Plaintiff points out that a state agency psychological consultant, Robert McFarlain, Ph.D., opined on October 24, 2002 that L.E.L. was markedly impaired in the domain of caring for himself because he would not bathe or change clothes, was not caring for his activities of daily living and had suicidal ideations, although without self-injury. (Tr. 128).  The Commissioner's regulations require the ALJ to consider the findings of State agency medical and psychological consultants, who are considered non-examining experts.  SSR 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).  The ALJ considered Dr. McFarlain's opinions, but he accepted them as valid only insofar as they were consistent with the ALJ's own findings.  (Tr. 23).  Because Dr. McFarlain's conclusion concerning this domain conflicted with the ALJ's conclusion, the ALJ rejected it.

In reviewing the record as of October 24, 2002, Dr. McFarlain specifically noted that "[t]here is conflicting [information] re: ADL's [activities of daily living] I hoped to reconcile with school ADL's, but they are not forthcoming in spite of heroic efforts to obtain." (Tr. 125).  Despite this conflict and the admitted lack of adequate records, Dr. McFarlain found the evidence "fully credible and indicative of marked impairment" in the domain of caring for oneself.  (Tr. 128).  He cited as supporting evidence:  (1) the

16

statement of plaintiff's mother in a "Function Report" form completed for the local Social Security office on June 25, 2002 that L.E.L. will not bathe or change clothes "without being told constantly" (Tr. 63); (2) a social worker's report dated December 26, 2001 on a Child Eligibility Checklist form that L.E.L. was "not caring for his [activities of daily living for] 6 months" (Tr. 119); and (3) a progress note of a social worker at the West Jefferson Child and Adolescent Clinic ("WJCAC") on June 14, 2002 that plaintiff was not sleeping because he played video games at night.  (Tr. 101).

The ALJ, who had the benefit of treatment records for almost nine more months than did Dr. McFarlain, resolved the conflict by finding "no evidence of impairment in the domain[ ] . . . of caring for yourself."  (Tr. 23).  Although it is incorrect to state that there is "no evidence," substantial evidence does support the ALJ's conclusion that L.E.L. has less than a marked limitation and is therefore not disabled.

First, the mere diagnosis of an illness or impairment does not establish that a claimant is disabled under the Act.  Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Secretary of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Martin v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995).  A diagnosed impairment must also have the findings shown in the Listing of that impairment, 20 C.F.R. § 416.925(d), or its

17

functional equivalent.  Thus, the diagnoses of depression and anxiety disorder alone are not substantial evidence that L.E.L. is markedly limited in his ability to care for himself.

Second, the ALJ found that the testimony of plaintiff and his mother concerning his functional limitations and restrictions of activities of daily living was exaggerated, lacked corroboration or substantiation in the medical evidence, and was not credible.  (Tr. 24).  The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and his evaluation is entitled to considerable deference by this court.  Falco v. Shalala, 27 F.3d 160, 164 & n.18 (5th Cir. 1994); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Villa, 895 F.2d at 1024. The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required.  Falco, 27 F.3d at 163-64; Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); accord James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 164).  Thus, the ALJ was not required to, and did not, accept Dr. McFarlain's credibility evaluation as to the three pieces of evidence that the psychologist cited, all of which were symptoms or problems self-reported by L.E.L. or his mother.

Moreover, the medical evidence includes conflicting evidence concerning the three criteria that Dr. McFarlain cited.  The ALJ "must resolve conflicts in the evidence." Martinez, 64 F.3d at 174.

In an undated letter from Sarah B. Moran, LCSW, at the YWCA "in response to request of information concerning [L.E.L.]," Moran stated that Miller had brought L.E.L. to the facility on January 8, 2001 because she suspected that he had been a victim of sexual abuse, which the child denied (and which is not supported by any of the other medical evidence). Moran said that "the following symptoms were reported at intake: . . . suicidal feelings." (Tr. 124). Moran's letter did not supply any details about the time period when those reported feelings occurred or their seriousness. Although Moran listed 13 dates when L.E.L. "received counseling," she provided no information at all concerning those visits. Her letter is not backed up by any medical documentation. A social worker is not an "acceptable medical source" who can "establish whether you have a medically determinable impairment(s)." 20 C.F.R. § 416.913(a).

On December 26, 2001, another social worker at WJCAC stated on a Child Eligibility Checklist form that L.E.L. "wrote [a] note about suicide" one year ago and had not been caring for his activities of daily living for six months. (Tr. 119). Again, there are no details about the seriousness of the "note about suicide."

However, the psychiatric and psychological evaluations performed during March and July 2002 affirmatively state that plaintiff does not have suicidal ideation. (Tr. 93, 105, 107, 110). Progress notes from plaintiff's treatment by a psychiatrist and social

19

workers at WJCAC from late 2002 through July 21, 2003 do not mention any suicidal thoughts.  (Tr. 139-49).

A psychiatrist, Brian Hammer, M.D., examined L.E.L. on March 11, 2003 for the Jefferson Parish Human Services Authority and found that plaintiff was well nourished, well developed and groomed.  He was cooperative and pleasant with good eye contact and no psychomotor or verbal problems.  He exhibited a "midrange affect"; linear, logical and goal-directed thought processes; intact concentration; and fair judgment and insight. Dr. Hammer diagnosed parent-child relational problem and anxiety disorder, not otherwise specified; noted plaintiff's "mild home problems"; and assessed a Global Assessment of Functioning Scale ("GAF") score of 65 to 70.  (Tr. 105).

Daliah Bauer, Ph.D., a psychologist who saw plaintiff the same day, described him as appropriately dressed, easily engaged and affable with a "bright affect."  She also diagnosed parent-child relational problem, anxiety disorder and rule out depression, not otherwise specified.  She assessed L.E.L's functioning on the GAF scale at 60.  (Tr. 107-08).  Finally, a social worker who also completed a detailed psychosocial assessment on March 11, 2002 noted the same diagnoses as Dr. Bauer and assigned a GAF score of 70. (Tr. 117).

"A GAF score of 60 reflects moderate symptoms or 'moderate difficulty in social, occupational, or school functioning.'  A GAF score of 61-70 reflects mild symptoms or

20

'some difficulty' in those areas, but the individual 'generally function[s] pretty well.'" <u>Sims v. Barnhart</u>, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders</u> 30, 32 (4th ed. 1994)). Thus, the psychological and psychiatric evaluations concerning plaintiff's self-care and activities of daily living during the nine months since Dr. McFarlain's report substantially support the ALJ's finding that L.E.L. does not suffer a marked impairment in the domain of caring for oneself.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  Douglass v. United

Servs. Auto Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  28th  day of March, 2007.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

22